IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JESSICA ELAINE WOLFE           :     CIVIL ACTION
                               :
          v.                   :
                               :
JEFFREY A. BEARD, et al.       :     NO. 10-2566


MEMORANDUM

McLaughlin, J.                               May 31, 2013

        The plaintiff in this case, Jessica Elaine Wolfe,
brings this suit for alleged constitutional deprivations suffered
while she was an inmate at State Correctional Institution at
Graterford ("SCI Graterford").  Since initiating this suit, Wolfe
has been released.  Wolfe's original complaint in this action
included counts against nine officials at SCI Graterford.
Following motions to dismiss both the initial complaint and
Wolfe's amended complaint, the Court dismissed the plaintiff's
claims against all but two of the defendants, Sergeant Andre
Zimmer, a correctional officer at SCI Graterford, and Sylvia
Pallott, a unit manager within the prison.  Those defendants
filed a motion for summary judgment, which the Court denied.

        Wolfe's remaining claims are as follows.  She alleges
that Zimmer used excessive force against her in violation of the
Eighth Amendment when he banged her head into a window and
indecently touched her breasts during her reentry into SCI
Graterford on October 21, 2009, and that Pallott retaliated
against her for engaging in conduct protected by the First

Amendment when she transferred Wolfe's cell because Wolfe had filed a grievance against another prison official.

The Court held a two-day bench trial.  This memorandum comprises the Court's findings of fact and conclusions of law. The Court finds for the defendants on both claims.

I.   Findings of Fact

   A.   The Plaintiff

   1.   Plaintiff Jessica Elaine Wolfe was a prisoner at SCI Graterford, a state prison for male inmates, from approximately December 13, 2001 to March 13, 2011.  9/10/12 Trial Tr. at 19:7-15, 174:18-20.

   2.   Wolfe is a transgendered woman.  She was born a biological male but has viewed herself as a female from a young age.  9/10/12 Trial Tr. at 19:16-24, 20:15-21.

   3.   Specifically, Wolfe is a transsexual, which she identifies as a person who has gone through the process of changing her sex.  Since 1995, Wolfe has undertaken the process of reassigning her sex from male to female.  On February 14, 1996, Wolfe began taking female hormones and "blockers" to stop the production of male hormones.  The female hormones have caused Wolfe to develop breasts and lose body hair, changed her voice, and feminized her.  Wolfe has also received counseling and, prior

-2-

to her incarceration, legally changed her name from James Wolfe to Jessica Wolfe.  9/10/12 Trial Tr. at 20:1-10, 20:22-21:6, 21:21-22:20, 23:6-24.

4.   While Wolfe was in the custody of the Pennsylvania Department of Corrections ("DOC"), she was treated by the medical department for being transsexual.  As part of her treatment, she continued to take hormones.  9/10/12 Trial Tr. at 25:15-26:1; PX 20.[1]

5.   When Wolfe entered the state prison system, she had long hair and breasts, although they were less developed than they are today.  9/10/12 Trial Tr. at 31:5-13.

6.   On December 10, 2002, Dr. N.E. Holland-Hull, a psychiatrist with the DOC, placed a restriction on cutting Wolfe's hair as part of her medical treatment.  PX 20.

   B.   The Defendants

7.   Defendant Andre Zimmer is a corrections officer at SCI Graterford.  He has been a sergeant at the facility since 1989.  9/11/12 Trial Tr. at 59:11-15, 76:5-7.

8.   Defendant Sylvia Pallott is a unit manager on Cell Block A at SCI Graterford.  She has held that position since March 30, 2010, and has worked as a unit manager at SCI

_____

   [1] "PX" refers to the plaintiff's trial exhibits, and "DX" refers to the exhibits submitted by the defendants at trial.

Graterford for approximately nine years.  9/11/12 Trial Tr. at
110:24-111:22.


        C.   Wolfe's Housing on A Block

        9.    Beginning in August 2005, Wolfe was housed on "A
Block" at SCI Graterford.  9/10/12 Trial Tr. at 175:12-14.

        10.  A Block is a long corridor and contains
approximately 400 cells on two tiers, an upper tier and a lower
tier.  As of 2010, A Block housed approximately 500 inmates.
9/11/12 Trial Tr. at 69:10-19; 9/10/12 Trial Tr. at 92:15-20,
130:1-3; PX 22; PX 24.

        11.  All cells on A Block, whether actually inhabited
by one or two inmates, are identical.  Each has a bunk bed and
can accommodate up to two inmates.  9/10/12 Trial Tr. at 109:19-
21, 110:14-18; PX 32; PX 33.

        12.  Wolfe had a "Z-code single cell status," which
meant that she could not be assigned to share a cell with anyone
else.  9/11/12 Trial Tr. at 112:13-18.  The first cell on A Block
to which Wolfe was assigned was 2-049.  The number designation
reflected the fact that Wolfe was in cell 49 on the second tier.
9/10/12 Trial Tr. at 34:5-6, 98:5-25; PX 25.

        13.  Although Wolfe lived in cell 2-049 by herself, the
side of A Block on which her cell was located was designated the
double-cell side, meaning that it was meant to house two inmates

                               -4-

per cell.  The opposite side of A Block was the single-cell side, which was supposed to house one inmate per cell.  Although cells on the single-cell side of A Block also contained a bunk bed, the top bunk was considered "taken off line."  9/11/12 Trial Tr. at 114:10-115:1, 118:6-8.

14.  Out of the nearly 50 cells on the same side and in the same area of A Block as cell 2-049, the majority housed two inmates.  Approximately 15 to 20 of them housed only one inmate. 9/10/12 Trial Tr. at 176:22-177:8.

15.  Some inmates who are alone in their cells can be housed with another inmate and are housed by themselves because a former cellmate has moved out or another reason.  As additional inmates are moved onto the block, they are housed with such inmates in a double cell.  9/11/12 Trial Tr. at 118:15-120:6.

16.  A Block contains a total of eight showers, four on the top tier and four on the bottom tier.  9/11/12 Trial Tr. at 129:5-7.

17.  There are two stairways in the middle of A Block. At the top of the stairways is a guard station and a shower next to it.  PX 23; PX 24; 9/10/12 Trial Tr. at 94:20-95:1.

18.  Wolfe's cell, cell 2-049, was 24 feet from those showers and the guard station.  Only one cell, 2-050, was closer to the showers.  Cell 2-050 also housed only one prisoner, a

transgender inmate named Simone.  9/10/12 Trial Tr. at 8:21-24, 99:3-12, 123:13-17; PX 25.

19.   Because of her transgender status, Wolfe tried to shower by herself.  9/10/12 Trial Tr. at 100:3-4.  When Wolfe first moved to A Block, she entered a shower where a group of Muslim men were bathing.  They told her, "don't find yourself in here again," and that, if she ever again walked in on them while they were showering, she was "going to have some consequences." Wolfe also had different inmates approach her, sometimes violently, in an attempt to elicit sexual favors.  Wolfe believed that inmates were attracted to her because she is a transsexual. Wolfe was aware that the showers were a location where sexual activity took place, and that there were instances of sexual violence and rape on A Block.  9/10/12 Trial Tr. at 30:2-24, 36:3-15, 108:1-8.

20.   From her cell, Wolfe was able to look through her cell door and view the entry to the nearest showers, enabling her to see when the last showering inmate had left.  After the last inmate in the showers left, Wolfe would open her door, run to the shower, and wave to the guard before entering the shower room. 9/10/12 Trial Tr. at 99:20-100:2, 100:14-20.

21.   Wolfe asked other inmates, including James Darras, to keep an eye out for her while she showered.  9/10/12 Trial Tr. at 100:5-13.

22.   Although inmates on A Block are permitted to shower in any of the showers on the block, Wolfe felt that other showers on the lower tier were less safe because they were less visible to the guards.  9/10/12 Trial Tr. at 107:10-16, 160:10-13.

D.   October 21, 2009 Incident

23.   In October 2009, Wolfe was transported from SCI Graterford to Allegheny County for a court hearing scheduled for October 14, 2009.  9/10/12 Trial Tr. at 36:20-37:6.

24.   Allegheny County sheriffs drove Wolfe back to SCI Graterford on October 21, 2009.  Upon arrival, the sheriffs pulled their van into a parking lot outside the prison's vehicle lock area, the prison's enclosed car port where vehicles transporting inmates enter and depart.  9/10/12 Trial Tr. at 37:10-18; 9/11/12 Trial Tr. at 59:23-60:4.

25.   Sergeant Zimmer and Correctional Officer Aaron Headen were on duty in the vehicle lock area when Wolfe arrived back at SCI Graterford on October 21.  Sergeant Zimmer was the officer in charge.  9/11/12 Trial Tr. at 60:5-7, 77:2-5, 99:9-15. Another correctional officer was also working in an enclosed and elevated observation room at the back of the vehicle lock area. 9/11/12 Trial Tr. at 77:8-19, 78:11-12; PX 31.

26.   Zimmer instructed the Allegheny sheriffs to drive

their van into the vehicle lock area, which they did.  The
sheriffs parked, and Zimmer ordered Wolfe out of the van.
9/10/12 Trial Tr. at 37:17-18, 39:10-18; 9/11/12 Trial Tr. at
61:2-10.  At the time, Wolfe was in full restraints, including
leg shackles, handcuffs, a waist chain, and a black box
connecting the waist chain to her handcuffs.  9/10/12 Trial Tr.
at 37:21-38:19.

        27.  Zimmer had never met Wolfe before October 21,
2009.  When he encountered Wolfe that day, Zimmer believed she
was a male because SCI Graterford only accepts male inmates.
9/11/12 Trial Tr. at 79:6-15.

        28.  After she got out of the van, Zimmer ordered Wolfe
to kneel on a chair that was located next to several windows
along the right wall of the vehicle lock area.  9/10/12 Trial Tr.
at 39:18-20, 41:11-12; PX 31.

        29.  Wolfe complied with Sergeant Zimmer's order to
kneel on the chair and did not disobey any other order from
members of law enforcement who were present in the vehicle lock
area.  Wolfe did not make any movements toward any of the
correctional staff or make any threatening statements.  9/10/12
Trial Tr. at 68:24-69:20; 9/11/12 Trial Tr. at 62:1-14.

        30.  While Wolfe was kneeling on the chair, Zimmer
slapped her inner thighs and told her to spread her legs so that
the Allegheny sheriffs could unshackle her.  The sheriffs removed

-8-

Wolfe's leg shackles, and Zimmer then pulled Wolfe to her feet. 9/10/12 Trial Tr. at 46:8-13, 223:18-21; 9/11/12 Trial Tr. at 83:7-13.  While Wolfe was situated on the chair, Zimmer also held her by her back or neck to stabilize her.  9/11/12 Trial Tr. at 91:20-92:1.  At no point did Zimmer slam Wolfe's head into a window.  9/11/12 Trial Tr. at 88:14-17, 104:14-17.[2]

31.  At this point, Headen was standing next to a metal detector along the same side of the vehicle lock area and near the chair on which Wolfe was kneeling.  He observed the activity on and around the chair.  Once Wolfe was brought to her feet, Headen took Wolfe's shoes so that they could be inspected for contraband.  9/11/12 Trial Tr. at 100:11-24, 102:11.

32.  Zimmer then conducted a pat-down search of Wolfe. The purpose of a pat-down search is to make sure that an inmate has no contraband, such as a cell phone, weapons, drugs, or pills.  9/11/12 Trial Tr. at 88:5-8.

---

[2] At trial, Wolfe testified that, while she was kneeling on the chair, Sergeant Zimmer placed his hand on the back of her neck and smashed her face into the window frame next to the chair.  9/10/12 Trial Tr. at 39:21-24.  Zimmer and Officer Headen, who was present during Wolfe's processing in the vehicle lock area that day, also testified at trial.  Both denied that Zimmer ever slammed Wolfe's head into a window.  9/11/12 Trial Tr. at 88:14-17, 104:14-17.

The Court concludes, after viewing the live testimony from all three witnesses, assessing their credibility, and reviewing contemporaneous prison grievances, other documents authored by Ms. Wolfe, and additional evidence, which are also discussed in the Court's findings of fact, that Zimmer did not slam Wolfe's face into a window in the vehicle lock area.

-9-

33.   Zimmer received training from the DOC on how to conduct a proper pat-down search.  Zimmer did not receive any specific training on conducting searches of transsexual inmates and, therefore, would search them in the same manner as a male inmate.  9/11/12 Trial Tr. at 64:1-10.

34.   Zimmer had Wolfe face the windows and then, from behind, patted down her shoulders, followed by her breasts, back, waist, legs, and feet.  9/10/12 Trial Tr. at 47:10-13; 9/11/12 Trial Tr. at 18:1-12, 84:16-25.  Following that, Zimmer instructed Wolfe to bend her head so that he could go through her hair for contraband.  He then waved a handheld metal detector near Wolfe's hair.  9/10/12 Trial Tr. at 48:19-24.  During his pat-down search, Zimmer did not notice that Wolfe had female breasts; he did not notice anything that differentiated Wolfe from other inmates who are male.  9/11/12 Trial Tr. at 86:12-24.

35.   Wolfe understood that she needed to be searched for contraband in the vehicle lock area before reentering the prison and that Zimmer patted her down to check for banned items. 9/11/12 Trial Tr. at 19:19-21; 9/10/12 Trial Tr. at 222:15-24.

36.   Wolfe felt that the manner in which Zimmer touched her breast area was "creepy."  9/10/12 Trial Tr. at 47:15-19.

37.   Zimmer touched Wolfe's chest area for a few seconds during the course of his pat-down search, and the entire search lasted about 15 seconds.  9/11/12 Trial Tr. at 106:2-10.

38.   After finishing his pat-down search of Wolfe, Zimmer then began to process Wolfe's property himself, taking a plastic bowl and throwing it so that it narrowly missed Wolfe's head and bounced off of the hood of the county sheriff's van. 9/10/12 Trial Tr. at 49:5-8, 219:14-17.

39.   Headen then put Wolfe's property in a box and escorted her through a door and downstairs to the prison intake area.  9/10/12 Trial Tr. at 221:5-24.

40.   At the time of the search, Wolfe never complained to Headen, Zimmer, or anyone else in Zimmer's presence that she had a head injury or that her head hurt.  9/11/12 Trial Tr. at 94:8-11, 104:18-20.

E.   Wolfe's Physical Condition On and After October 21, 2009

41.   After she was searched by Zimmer, Wolfe was taken to the infirmary to see if the "pill line" staff who hand out inmate medications had her medication available.  Wolfe did not at that time mention to the infirmary staff that Zimmer had hurt her or that any other incident involving Zimmer occurred in the vehicle lock area.  9/10/12 Trial Tr. at 53:6-16, 53:22-23.

42.   Following intake back into SCI Graterford, Wolfe was housed in the basement, where new arrivals stay, until October 23.  9/10/12 Trial Tr. at 52:14-21, 54:7-8, 58:22-24.

43.   When Wolfe returned to her cell on A Block on October 23, she had no noticeable signs of injury to her forehead.[3]  9/10/12 Trial Tr. at 56:19-22.

44.   Wolfe never sought medical treatment for an injury to her head.  9/10/12 Trial Tr. at 57:1-2; 9/11/12 Trial Tr. at 30:11-13.

45.   Wolfe had a history of migraine headaches before returning to SCI Graterford on October 21, 2009.  9/11/12 Trial Tr. at 29:9-11.  After her return on that date and following her placement back on A Block, Wolfe experienced migraines.  Wolfe had migraines on October 23, 24, and 25, 2009, and a light headache on October 26.  9/10/12 Trial Tr. at 60:2-14; PX 15 ¶¶ 11-14.  She also experienced migraines on November 17, 18, 29, and 30.  In addition, in November, Wolfe became sick to the point that she was vomiting blood.  PX 15 ¶¶ 20-22, 29-30.  Wolfe never expressed to anyone in SCI Graterford's medical department that her migraines or vomiting were related to an incident with Sergeant Zimmer.  Wolfe told the prison's medical staff that she

---

[3] Darras, a fellow inmate on A Block, testified that he saw a "reddish," golf-ball-sized lump on Wolfe's forehead when she returned to A Block and that she was putting ice on it.  He also testified that Wolfe had the lump for a few days.  9/10/12 Trial Tr. at 146:23-148:2.  This testimony contradicts Wolfe's own testimony that she had no visible injury to her forehead by the time she returned to A Block.  The Court finds it unlikely that Wolfe would minimize her injuries in connection with her excessive force claim.  For that reason, the Court credits Wolfe's testimony and finds that she had no noticeable injury to her forehead by the time she returned to A Block.

thought her vomiting was due to someone poisoning her food. 9/11/12 Trial Tr. at 36:16-22.

46.   Wolfe maintained a calendar while she was an inmate at SCI Graterford and used it to keep track of personal information.   Wolfe's entry for October 21, 2009 did not mention any incident involving Zimmer in the vehicle lock area.   9/10/12 Trial Tr. at 58:9-15, 59:23-60:1; PX 16.

47.   Wolfe also kept a journal in which she described events that occurred while she was incarcerated.   Wolfe wrote in her journal about her return to SCI Graterford from Allegheny County on October 21.   Her entry did not state that Zimmer banged her head into a window or that he touched her breasts while they were in the vehicle lock area, although it did state that Zimmer had "victimized" her.   9/10/12 Trial Tr. at 63:1-64:7, 66:10-13; PX 15 ¶ 4.


   F.   Complaints Regarding October 21, 2009 Incident

48.   On October 22, 2009, Wolfe filed grievance number 293611, in which she alleged that, the day before, Zimmer had conducted a cavity search on her in the vehicle lock area and that he had required her to "strip and pose specifically."   The grievance did not allege that Zimmer banged Wolfe's head on a window.   PX 2.   Zimmer did not ask Wolfe to get undressed and pose and he did not perform a cavity search, which, at the time

Wolfe filed her grievance, she believed meant touching her body indecently.  9/11/12 Trial Tr. at 18:23-19:10, 52:3-8.  DOC staff denied Wolfe's grievance and her grievance appeals, finding her allegations that Zimmer had conducted an improper pat-down search to be unfounded.  DX 2.

49.   After returning to A Block on October 23, Wolfe filed a second grievance regarding Zimmer's conduct in the vehicle lock area because she was not sure that the grievance coordinator had received the first grievance filed the day before.  Wolfe's October 23 grievance was substantively the same as her October 22 grievance.  PX 3; 9/11/12 Trial Tr. at 49:23-50:9.  This second complaint was denied because it duplicated allegations in Wolfe's first-filed grievance.  DX 3.

50.   On December 29, 2009, Wolfe wrote a letter to the Pennsylvania State Police complaining about the manner in which she was processed in SCI Graterford's vehicle lock area on October 21.  She stated that Zimmer, among other things, held her head against the metal edge of a window for several minutes. DX 10.  The police responded to Wolfe's letter and informed her that the incident was not a criminal matter.  DX 11.


G.   Wolfe's Grievance Against Bud Thomas

51.   In 2009, Wolfe worked in SCI Graterford's paint

shop, a job that involved painting various areas of the prison. Wolfe's supervisor was Bud Thomas.  9/10/12 Trial Tr. at 79:9-15.

52.  On March 2, 2010, several months after filing her grievances against Zimmer, Wolfe also filed a grievance against Thomas.  She alleged that Thomas lowered her pay; refused to pick her up for work from her cell block, which is required for an inmate to be released for work detail; and tried to terminate her from her job in the paint shop, all in retaliation for filing her complaint against Zimmer.[4]  PX 4; 9/10/12 Trial Tr. at 79:4-7, 79:18-80:14.

53.  Wolfe's grievance was denied, and she appealed the denial to the superintendent on March 24, 2010.  PX 7; 9/10/12 Trial Tr. at 86:17-19; PX 8.

54.  The superintendent wrote a memorandum, dated March 26, 2010, stating that he was remanding the matter and assigning investigation of the grievance to unit manager Sylvia Pallott.  The memorandum did not carbon copy Pallott.  PX 9.

55.  Wolfe received a copy of this memorandum.  9/10/12 Trial Tr. at 87:23-88:3.  Pallott, however, did not receive a copy and did not learn that she had been assigned to investigate Wolfe's grievance.  9/11/12 Trial Tr. at 123:15-124:19.

---

[4] For purposes of this opinion, the Court need not assess and makes no finding as to the veracity of Wolfe's underlying allegations against Thomas.  The only fact relevant to the present case is that Wolfe filed a grievance against Thomas.

-15-

56.   Pallott knew Bud Thomas from her work at the prison and spent some time with him.   Thomas also oversaw the paint crew that painted Pallott's office.  9/10/12 Trial Tr. at 134:5-9; 9/11/12 Trial Tr. at 71:13-72:11.

57.   When Wolfe first filed her grievance against Thomas, Pallott did not supervise Wolfe's cell block.  Wolfe never had a discussion with Pallott regarding her grievance against Thomas.  9/10/12 Trial Tr. at 186:24-187:9, 210:7-211:14.

H.   Wolfe's Cell Transfer

58.   Pallott had been Wolfe's counselor when Wolfe lived on a different block at the prison.  During that time, Wolfe and Pallott had some interpersonal conflicts.  9/10/12 Trial Tr. at 176:8-21.

59.   Beginning on March 30, 2010, Pallott was assigned to be the unit manager for A Block.  9/11/12 Trial Tr. at 111:14-16.  As a unit manager, Pallott was responsible for making inmate cell assignments and had discretion to choose among available cells when making placement decisions.  Pallott knew that factors such as age or disability could make a certain inmate more vulnerable.  She also knew that transsexual inmates face certain risks living in prison.  9/11/12 Trial Tr. at 68:8-69:2, 132:7-15.

60.   Inmates on A Block are not entitled to the cell of

-16-

their choice.  9/10/12 Trial Tr. at 163:3-7, 181:22-25; 9/11/12
Trial Tr. at 126:25-127:2.

61.    When Pallott became unit manager for A Block, she
received a directive from the prison's superintendent to move all
single-cell designated inmates to the single-cell side of the
block.  9/11/12 Trial Tr. at 120:11-121:8.

62.    Pallott maintained a list of inmates on A Block
who are entitled to be housed in a single cell, either because
they are "Z-coded" or because they have earned the right to a
single cell based on good conduct and a certain amount of time
spent in the Pennsylvania prison system.  An inmate's relative
placement on the single-cell list corresponds to the amount of
time he or she has spent in the prison system; the longer an
inmate has been in DOC custody, the higher he or she is on the
list.  As beds on the single-cell side of A Block became
available, Pallott started moving inmates according to their
ranking on the single-cell list.  Wolfe was on this list.
9/11/12 Trial Tr. at 117:10-118:3, 121:16-122:3, 127:22-128:6.

63.    On April 6, 2010, after Wolfe received a copy of
the superintendent's March 26 memorandum but before she heard
anything further regarding the status of her grievance, Pallott
called Wolfe into her office and informed Wolfe that she was
being transferred from cell 2-049 to cell 87 on the lower tier
and opposite side of A Block.  9/10/12 Trial Tr. at 102:17-24,

-17-

116:5-10, 195:22-25.  Pallott told Wolfe that she needed to be
transferred from the double-cell side of A Block to a cell on the
opposite, single-cell side of the block.[5]  9/11/12 Trial Tr. at
7:5-17, 126:6-15.

    64.  At their meeting, Wolfe objected to the cell
transfer and said that it would be inappropriate to move her to a
cell on the lower tier where inmates could more easily watch her
undress.  9/10/12 Trial Tr. at 91:20-92:6.  Pallott told Wolfe
that she could cover the window to her cell while she changed to
prevent other inmates from watching her undress.  9/10/12 Trial
Tr. at 214:18-215:6.

    65.  Wolfe was also concerned because cell 87 is 77
feet from the nearest shower, approximately three times as far as
cell 2-049 from the showers and guard station.  9/10/12 Trial Tr.
at 9:1-6; 92:6-11, PX 22.  In addition, the showers on the lower
tier of A Block are "gang" showers, which can accommodate up to
12 people showering at one time and are not visible to the guards

---

[5] At trial, Wolfe testified that Pallott never explained at
their April 6, 2010 meeting why Wolfe was being transferred to
the opposite side of A Block and specifically denied that Pallott
had said she was transferring Wolfe to the single-cell side of
the block.  9/11/12 Trial Tr. at 5:11-20.  At an earlier
deposition in this action, however, Wolfe testified that Pallott
had told her that she needed to move Wolfe from the double-cell
side to the single-cell side of the block.  9/11/12 Trial Tr. at
7:15-17.  The Court credits Wolfe's earlier deposition testimony,
and will accept it for the truth of the matter asserted.  See
Fed. R. Evid. 801(d)(1)(A).

in the guard station.  Wolfe felt that these showers were not safe for her.  9/10/12 Trial Tr. 107:13-23.

66.  Cell 87 also was in an area that mostly housed Muslim inmates.  Wolfe was concerned about being placed in such an area due to her previous experience being approached and warned by Muslim inmates in the shower on A Block.  9/10/12 Trial Tr. at 103:3-8.

67.  The same day that Pallott informed Wolfe that she would be transferring cells, Wolfe filed a grievance against Pallott.  She claimed that Pallott was placing her in an area of A Block that was unsafe.  She did not allege that Pallott was retaliating against her for previously filing a grievance against Bud Thomas.  DX 6; 9/10/12 Trial Tr. at 198:1-12.

68.  Wolfe's grievance and ensuing appeals were denied. The DOC personnel that reviewed her grievance determined that Wolfe had been housed on the double-cell side of A Block, but had progressed to the top of the single-cell list and was moved accordingly.  They found no evidence of negligence or retaliation on Pallott's part.  DX 6.

69.  Wolfe moved to cell 87 on or about April 7, 2010, and lived there for approximately ten months until February 2011. 9/10/12 Trial Tr. at 105:17-20.

70.  When Wolfe went to the shower from cell 87, she

-19-

heard an inmate yell, "hey, bitch is goin' to the shower."  Wolfe
never received similar comments when she would go from cell 2-049
to the nearest showers on the upper tier.  The comment made Wolfe
feel uncomfortable and as if other inmates were going to follow
her.  9/10/12 Trial Tr. at 214:17; 9/11/12 Trial Tr. at 57:12-
58:4.  As a result, Wolfe resorted to taking "birdbaths," in
which she would wash herself in the sink in her cell.  9/10/12
Trial Tr. at 108:16-18.

          71.  Wolfe was concerned for her safety while she lived
in cell 87 for additional reasons.  The window of Wolfe's new
cell on the bottom tier faced out onto the prison recreation
yard.  Other inmates would stand out of view of Wolfe in the yard
and say "perverted" things to her through the window.  9/10/12
Trial Tr. at 105:22-106:12.  In addition, inmates were permitted
to leave their cells three times a day, often convening around
tables on the lower tier.  During those times, Wolfe was nervous
that another inmate would come into her cell.  9/10/12 Trial Tr.
at 97:3-25, 106:15-19, 109:1-8.


     I.  Status of Cells After Wolfe's Transfer

          72.  After Wolfe's cell reassignment, two inmates moved
into her old cell, cell 2-049.  Other single-inmate cells near
Wolfe's original cell were also converted into double cells.
9/10/12 Trial Tr. at 155:21-156:5, 156:17-25.

73.   Other inmates on the single-cell list, but housed on the double-cell side of A Block, were moved to cells on the single-cell side.  Although the precise timing of these other transfers is not clear, they appear to have taken place months after Wolfe was moved.  9/11/12 Trial Tr. at 127:5-10; 9/10/12 Trial Tr. at 156:1-5, 156:17-157:5.

74.   Even after Wolfe transferred cells, certain cells on the double-cell side of A Block continued to house only one inmate, and some cells on the single-cell side of the block housed two inmates.  9/10/12 Trial Tr. at 137:6-138:2, 177:17-19; 9/11/12 Trial Tr. at 56:5-12.

75.   In part, that is because cell transfers were made as cells became available, and normally there are very few free cells.  9/11/12 Trial Tr. at 121:16-18, 127:11-21, 132:9-10.

## II.  Conclusions of Law[6]

Presently before the Court are Wolfe's remaining two § 1983 claims.  Wolfe first asserts that Zimmer violated her Eighth Amendment right to be free of "cruel and unusual punishment" during her intake through the vehicle lock area on October 21, 2009.  Wolfe next alleges that Pallott's decision to transfer her cell was made in retaliation for Wolfe engaging in

---

[6] Reference to the above Findings of Fact shall be abbreviated "FOF."

-21-

the constitutionally protected act of filing an inmate grievance against her supervisor in the paint shop, Bud Thomas.  Wolfe bears the burden of proving by a preponderance of the evidence the elements of her § 1983 claims against both Zimmer and Pallott.  See, e.g., Reedy v. Evanson, 615 F.3d 197, 213 (3d Cir. 2010).

The Court concludes that Wolfe has not established either claim by a preponderance of the evidence and finds in favor of the defendants on both claims.

A.   Eighth Amendment Claim

The Eighth Amendment's prohibition against "cruel and unusual punishment" in the prison setting protects against the "'unnecessary and wanton infliction of pain.'"  Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).  Prison officials are found to use excessive force if the use of force is not applied in a "good-faith effort to maintain or restore discipline" but rather is applied "maliciously and sadistically to cause harm."  Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).  In evaluating an excessive force claim, a court must consider the following factors: (a) the need for the application of force, (b) the relationship between the need and the amount of force actually used, (c) the extent of

-22-

injury inflicted, (d) the extent of the threat to staff and inmate safety, as reasonably perceived by responsible officials on the basis of the facts known to them, and (e) the efforts made to lessen the severity of the use of force.  Hudson v. McMillian, 503 U.S. at 7; Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009); Smith v. Mensinger, 293 F.3d 641, 648-49 (3d Cir. 2002).

Wolfe's Eighth Amendment claim against Zimmer has two components.  She alleges that Zimmer slammed her head into a window and inappropriately rubbed her breasts during his pat-down search.  The Court addresses each in turn.

Quite plainly, Wolfe's excessive force claim based on the application of force to her head comes down to a factual determination between the competing versions of events presented by Wolfe and Zimmer.  Wolfe testified that Zimmer slammed her head into a window in the vehicle lock area.  9/10/12 Trial Tr. at 39:21-24.  Both Zimmer and Officer Headen, who was present in the car port while Wolfe was being processed for reentry into SCI Graterford, deny that Zimmer ever banged Wolfe's head against a window.  9/11/12 Trial Tr. at 88:14-17, 104:14-17.  As noted in the above findings of fact, the Court finds that Zimmer did not slam Wolfe's head into a window.  FOF ¶ 30.

In addition to basing its factual finding on an assessment of the witnesses' live testimony, including determinations of credibility, the Court reaches this conclusion

based on other evidence in the trial record.  On October 21, 2009, the day of her processing through the vehicle lock area, Wolfe did not complain to Headen, Zimmer, or anyone in Zimmer's presence that she had suffered a head injury or that her head hurt.  Nor did Wolfe make any complaint of injury to the medical staff that she saw at the infirmary immediately upon intake.  In fact, Wolfe never sought medical treatment for an injury to her head.  Wolfe also did not make mention of Zimmer hitting her head into a window in either of two successive grievances that she filed in the two days after her return to the prison, a calendar that she maintained to keep track of personal information, or her journal in which she described daily events of note.  Lastly, by the time she returned to her cell in A Block on October 23, two days after her interaction with Zimmer, Wolfe had no noticeable head injury.  FOF ¶¶ 40-41, 43-44, 46-49; see also Smith, 293 F.3d at 649 (noting that a factfinder may rely on the *de minimis* nature of injuries to conclude that a defendant's account of the incident is more believable).

Although Wolfe experienced migraines and vomiting after returning to her cell on A Block, she had a history of migraines that predated her intake on October 21.  FOF ¶ 45.  The Court is not persuaded that any ailments suffered after that date were the result of a head injury caused by Sergeant Zimmer or stress related to his alleged use of excessive force.  Wolfe has offered

-24-

no evidence from medical personnel connecting the migraines, headaches, vomiting, or any other medical issues to the possible use of force against her head.  Indeed, Wolfe herself never told any medical personnel at the prison that she believed her migraines and vomiting were the result of an injury inflicted by Zimmer.  Rather, with respect to her vomiting, Wolfe posited that someone was poisoning her food.  Id.

The first mention of Zimmer forcing Wolfe's head against a window came in Wolfe's December 2009 complaint to the Pennsylvania police force, made approximately two months after she was returned to prison.  Even then, Wolfe did not allege that Zimmer banged her head into the window.  She claimed that Zimmer pressed her head against the metal edge of the window for several minutes.  Id. ¶ 50.

Based on its review of this evidence, the Court finds that Zimmer did not slam Wolfe's head into a window.  That being so, Wolfe's excessive force claim based on this alleged action fails.

Wolfe's claim that Zimmer violated the Constitution when he touched the area around her breasts as part of a pat-down search requires independent analysis.  The Court of Appeals for the Seventh Circuit has found that a bodily search of an inmate may violate the Eighth Amendment where it is not conducted in accordance with legitimate penological purposes and instead is

"conducted in a harassing manner intended to humiliate and inflict psychological pain."  Calhoun v. DeTella, 319 F.3d 936, 939 (7th Cir. 2003); see also Hudson v. Palmer, 468 U.S. 517, 530 (1984) (counseling that the Eighth Amendment protects prisoners from searches that amount to "calculated harassment unrelated to prison needs").  Indeed, several courts of appeals have determined that sexual touching, physical harassment, and unwarranted intrusions on a prisoner's bodily integrity can rise to the level of an Eighth Amendment violation.  See, e.g., Wood v. Beauclair, 692 F.3d 1041, 1046 (9th Cir. 2012); Washington v. Hively, 695 F.3d 641, 643 (7th Cir. 2012); Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997); Boddie v. Schnieder, 105 F.3d 857, 860-62 (2d Cir. 1997).

Assuming that similar standards apply within this circuit, the Court concludes that Zimmer's pat-down search of Wolfe's chest area did not amount to unlawful sexual harassment or abuse in violation of the Eighth Amendment.  Zimmer admits that he touched Wolfe's breasts and chest area as part of his pat-down search in the vehicle lock area.  The Court finds that this was nothing more than a routine inmate search for contraband.  Zimmer only touched Wolfe's chest for a few seconds during the course of a search that, in its entirety, lasted a total of about 15 seconds.  FOF ¶¶ 34, 37.  Aside from stating that she found his search to be "creepy," a subjective assessment

that the Court has no reason to doubt, Wolfe offered no evidence
at trial that the search was intentionally carried out in a
sexually aggressive or humiliating manner.  That is important,
for the Eighth Amendment is offended only when a prison official
engages in conduct with a particular purpose, i.e., "maliciously
and sadistically to cause harm."  Hudson v. McMillian, 503 U.S.
at 7; Brooks v. Kyler, 204 F.3d 102, 109 (3d Cir. 2000); see also
Hudson v. Palmer, 468 U.S. at 530 (stating that searches
constituting "*calculated* harassment" are prohibited by the Eighth
Amendment (emphasis added)).  The fact that Zimmer threw a
plastic container in Wolfe's direction following his search is
not enough to demonstrate that the pat down was similarly
aggressive or sexually abusive.

It may be that Zimmer would have conducted a modified
search had he realized that Wolfe was a female instead of a male.
At the time of the search, however, Zimmer did not realize that
Wolfe was a female and did not notice that she had female
breasts.[7]  FOF ¶¶ 27, 34.  Given that his search lasted only a
few seconds and covered areas that seem to be within the ambit of
a typical male inmate frisk search, the Court finds that Zimmer's
search comported with applicable constitutional standards.

---

[7] The Court finds credible Zimmer's failure to realize that
Wolfe was a female or transsexual given that Wolfe was
incarcerated in a prison that houses male inmates and she was in
a transitional phase of her sex reassignment.  FOF ¶¶ 1, 3, 5.

The Court's legal conclusion that Zimmer's search did not violate the Eighth Amendment is bolstered by the fact that other courts within this circuit have determined that a frisking officer's contact with an inmate's genitals or private areas during a single pat-down search is insufficient to constitute an Eighth Amendment violation.  See Hughes v. Smith, 237 F. App'x 756, 759 (3d Cir. 2007) (per curiam) (no Eighth Amendment violation where officer touched inmate's testicles through clothing during pat-down search and had previously made sexual comments); Kiser v. Kramer, No. 10-609, 2010 WL 4513421, at *3 (D. Del. Nov. 2, 2010) (officer pulling inmate's testicle during a single pat-down search did not amount to constitutional violation).  Zimmer's contact with Wolfe's breasts, which was routine in nature, is far less offensive than the conduct at issue in either Hughes or Kiser.[8]

B.   Retaliation Claim

Actions that, on their own, do not violate the Constitution may nonetheless constitute a constitutional tort "if motivated in substantial part by a desire to punish an individual

---

[8] The Court offers no opinion as to whether it would similarly find no Eighth Amendment violation under the circumstances at issue in Hughes or Kiser, and cites these cases merely to demonstrate that more sexually and physically aggressive conduct than that at issue here has fallen short of making out an Eighth Amendment claim.

for exercise of a constitutional right." Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000) (quotation marks and citation omitted).  In order to prevail on such a retaliation claim, a prisoner plaintiff must prove the following elements: (1) the conduct that led to the alleged retaliation was constitutionally protected; (2) the plaintiff suffered an "adverse action" at the hands of prison officials; and (3) the constitutionally protected conduct was a "substantial or motivating factor" in the decision to impose the adverse action. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (quotation marks omitted).  Once an inmate establishes these three prima facie elements, prison officials may still defeat a claim of retaliation by "proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Id. at 334.

Wolfe's retaliation claim, although satisfying the first two required elements, falters on the third.  Filing an inmate grievance, such as the one Wolfe lodged against Bud Thomas, is conduct protected by the First Amendment. Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003); see also Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).  Wolfe's transfer from cell 2-049, located only 24 feet from the nearest shower and the central guard station on the upper tier of A Block, to cell 87, which was 77 feet from a shower that was far less visible to the

guards and on the lower tier nearer to where inmates congregated during their free time, also appears to be sufficiently adverse for purposes of making out a retaliation claim.  Considering Wolfe's transsexual status, this cell transfer would be sufficient to "deter a person of ordinary firmness from exercising [her] First Amendment rights."  Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) (quotation marks omitted); Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) (en banc) (per curiam).

The problem for Wolfe is that there is no causal nexus between her grievance against Thomas and her cell transfer.  It is true that Pallott informed Wolfe of her cell move only eleven days after the superintendent issued a memorandum, which stated, in part, that Pallott should investigate Wolfe's claim.  FOF ¶¶ 54, 63.  "[S]uggestive temporal proximity" between protected activity and adverse action can establish retaliatory motive. Rauser, 241 F.3d at 334; see also Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000).

Yet, Pallott was not copied on the superintendent's memorandum and she never received it prior to notifying Wolfe that she would be transferred.  Pallott never spoke to Wolfe about the grievance she had filed against Thomas and there is nothing else in the record to suggest that Pallott was otherwise aware of the grievance.  FOF ¶¶ 55, 57.  The fact that she was

friendly with Thomas and that he oversaw the crew that painted
her office does not lead the Court to infer that Thomas made
Pallott aware of the pending grievance.  Accordingly, Pallott's
cell transfer could not have been motivated by an intent to
retaliate against Wolfe for filing that grievance.  Ambrose v.
Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only
intuitive that for protected conduct to be a substantial or
motivating factor in a decision, the decisionmakers must be aware
of the protected conduct.").

       Furthermore, Pallott transferred Wolfe's cell in
furtherance of a legitimate, non-retaliatory directive from the
prison superintendent.  Although at all relevant times assigned
to a single-occupant cell, Wolfe's original cell on A Block was
located on the side of the block designated for two-inmate cells.
When she took over as unit manager for A Block, Pallott was
instructed to move all inmates requiring a single cell to the
opposite, single-cell side of the block.  Pallott kept a list of
inmates requiring single cells.  Consulting her list, Pallott
determined that Wolfe was slated for transfer and moved her to
cell 87, located on the single-cell side of the block.  Following
her cell transfer, two inmates moved into Wolfe's cell.  Other
inmates in Wolfe's position were similarly transferred to the
single-cell side of A Block and other cells near cell 2-049 that

had previously housed only one inmate were converted into double cells.  FOF ¶¶ 13, 61-63, 72-73.

The fact that, even after Wolfe changed cells, some cells on the double-cell side of A Block continued to house only one inmate and certain cells on the single-cell side of A Block housed two inmates does not undermine this conclusion.  Certain inmates on the double-cell side of the block were housed by themselves merely because their former cellmate had moved out or for another reason that did not preclude them from sharing a cell; as new inmates were assigned to the block, they could be and were assigned to those cells.  In addition, cell transfers were made as cells became available.  As a general matter, there were very few free cells on A Block.  Id. ¶¶ 15, 75.  From these facts, the Court infers that all inmates could not immediately be accommodated on the appropriate side of A Block at or near the time Wolfe was transferred.

The Court ultimately finds that Pallott's decision to move Wolfe's cell was not retaliatory.


III. Conclusion

For the foregoing reasons, the Court finds in favor of the defendants on Wolfe's Eighth Amendment and retaliation claims, and will grant judgment in the defendants' favor.  An appropriate order issues separately.